DORON WEINBERG (SBN 46131)
LAW OFFICES OF DORON WEINBERG
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile:  (415) 552-2703
doronweinberg@aol.com

Attorney for Defendant
KEVIN B. CULLINANE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  CR-14-0534 CRB |
| Plaintiff, | **DEFENDANT KEVIN B. CULLINANE'S SENTENCING MEMORANDUM** |
| vs. | DATE:     April 26, 2018 |
| KEVIN B. CULLINANE, et. al., | TIME:     1:30 p.m. |
| | JUDGE:   Honorable Charles R. Breyer |
| Defendant. | COURT:   6, 17th Floor |

**TABLE OF CONTENTS**

**PAGE**

1.   *The Offense Conduct* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.   *Guideline Calculations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   *Volume of Commerce* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   *Role in The Offense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3.   *Disparity of Sentences* .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.   *U.S.S.G. § 3553 Factors* .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.   *The Nature and Circumstances of the Offense* . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   *Defendant's Personal History and Characteristics* . . . . . . . . . . . . . . . . . . . . . 11

# TABLE OF AUTHORITIES

**CASES**   **PAGE**

*United States v. Chau*, 293 F.3d 96 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Frega*, 179 F.3d 793 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Fuller*, 897 F.2d 1217 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Harvey*, 532 F.3d 326 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. John Michael Galloway* (N.D. CA Case No. CR-14-607 PJH) . . . . . . . . . 1,6,7,9

*United States v. King*, 257 F.3d 1013 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. McCoy*, 242 F.3d 399 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


**STATUTES AND OTHER AUTHORITIES**

United States Sentencing Guidelines § 2R1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

United States Sentencing Guidelines § 3B1.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States Sentencing Guidelines § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10,13

DORON WEINBERG (SBN 46131)
LAW OFFICES OF DORON WEINBERG
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472
Facsimile:  (415) 552-2703
doronweinberg@aol.com

Attorney for Defendant
KEVIN B. CULLINANE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>   )<br>   Plaintiff,   )<br>   )<br>vs.   )<br>   )<br>KEVIN B. CULLINANE, et. al.,   )<br>   )<br>   Defendant.   )<br>_____) | **CASE NO. CR-14-0534 CRB**<br><br>**DEFENDANT KEVIN B. CULLINANE'S SENTENCING MEMORANDUM**<br><br>DATE:    April 26, 2018<br>TIME:    1:30 p.m.<br>JUDGE:  Honorable Charles R. Breyer<br>COURT:  6, 17th Floor |

  The sentencing of Kevin Cullinane comes before this Court in an unusual posture which presents a substantial challenge not only to defendant and counsel but to the Court as well.

  Twenty-three defendants are before the Court for sentencing, twenty-one of whom have entered into plea agreements and have stipulated in many cases to enhancements for their role in the offense and have agreed that the volume of commerce for Guideline sentencing purposes is the total value of the properties with respect to which they were "involved" in bid-rigging, irrespective of the level of participation or the profit they actually realized. The first eighteen of those defendants also agreed to plead guilty to mail fraud, a crime which they had not in fact committed, as Chief Judge Hamilton subsequently ruled in *United States v. John Michael*

_____
Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)       1

*Galloway*, Case No. CR-14-607 PJH, a parallel bid-rigging prosecution arising from essentially similar allegations. They did so because these admissions were the prerequisite for their entry into cooperation agreements that they understood would result in substantially reduced sentences.

The agreements demanded by the government skewed the sentencing process for Kevin Cullinane in several ways. First, because twenty-one of twenty-three defendants involved in the same criminal conduct eventually agreed to cooperate with the government there was little the government did not already know about the case and little that any one defendant could add to the government's knowledge. Some cooperating defendants were therefor motivated to elaborate and even fabricate allegations in order to make their cooperation appear more valuable. This appears to have generated several false or misleading allegations involving Kevin Cullinane.

Second, cooperating defendants were deterred from challenging the specific elements of the government's sentencing Guidelines' calculations, in the expectation that a downward departure for substantial assistance would negate the upward adjustments. Thus, all of the cooperating defendants acceded to the government's flawed methodology for calculating the volume of commerce and for attributing aggravating roles to individuals, without challenge.

Third, the government's approach to entering into cooperation agreements with defendants created an inherent and unjustifiable disparity in the sentences recommended for defendants whose culpability and circumstances are essentially the same. The government declined to allow defendants to enter into cooperation agreements unless they pleaded guilty to mail fraud, a charge which was plainly invalid and should not have been made. Although he readily admitted and was prepared to accept responsibility for his involvement in bid-rigging, Kevin Cullinane's unwillingness to plead to a crime he did not commit prevented him from providing the cooperation he offered the government and receiving the commensurate reduction in sentence.

---

Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)              2

So, while other defendants were willing to put themselves before the Court for sentencing based on offenses they did not commit and sentencing factors that do not apply, Kevin Cullinane asks the Court to employ those sentencing Guidelines that properly apply to his offense and to judge him only on what he actually did and who he actually is, and therefor on the nature and circumstances of his offense and his individual history and characteristics, in comparison to the actual conduct of other defendants who committed similar offenses.

1. *The Offense Conduct*

As noted in the PSR, the description of defendant Cullinane's conduct, particularly in ¶¶ 18 and 20, contains many incorrect statements which are based on misinformation, primarily supplied by cooperating witness Laith Salma. It appears that Mr. Salma attempted to enhance the value of the information he provided to the government by minimizing his own role and exaggerating the role of others, thus putting himself in the position of a victim, whose own criminal conduct was the result of pressure from others. This appears to be the principal basis for the PSR's conclusion that defendant Cullinane was a "manager or supervisor" of the criminal activity of others. These allegations are largely untrue but, as will be argued more fully below, even if true they do not suffice to designate Kevin Cullinane as a manager or supervisor of the criminal activity of others.

2. *Guideline Calculations*

    A. *Volume of Commerce*

The PSR properly begins its Guideline calculation with a Base Offense Level of 12 pursuant to U.S.S.G. § 2R1.1(a), and then suggests that the Base Offense Level should be increased 5 levels by the addition of 1 point for bid-rigging and 4 points for volume of commerce over $10 million. It also recommends an upward adjustment of 3 levels for defendant's role in the offense as a manager or supervisor of the criminal activity. Defendant submits that the

adjustments for specific offense characteristics are greater than called for by the facts and circumstances of defendant's conduct, and the upward adjustment for leadership role is inappropriate.

U.S.S.G. § 2R1.1 Application Note 7, states that "[t]he agreements among competitors covered by this section are almost invariably covert conspiracies that are intended to, and serve no purpose other than to, restrict output and raise prices, and that are so plainly anti-competitive that they have been recognized as illegal *per se*, *i.e.,* without any inquiry in individual cases as to their actual competitive effect." Plainly, this does not describe the conduct in which defendant Cullinane was involved. Rather, it addresses the collusion among providers of services or products to extract a higher price from consumers for those services and products than they would be able to obtain if the prices were set competitively. It is appropriate in those circumstances to measure the harm to the general public by the total volume of commerce affected.

That measure is far less clearly appropriate in the circumstances of this case, where the agreement was not one that caused consumers to pay more than they should have, but rather served to reduce the profits made by banks and lenders on their foreclosed mortgages. In these circumstances it is unreasonable to attribute to Kevin Cullinane a volume of commerce totaling $17 million based on the full price of each of the properties which he participated in purchasing when the potential, indeed speculative, return to the lender would have been in most cases only one or two percent higher than the actual purchase price.

Further, attributing the entire value of the property to defendant Kevin Cullinane as his "volume of commerce" is inconsistent with the intent of U.S.S.G. § 2R1.1(b)(2) which states that the measure of culpability should be limited to the "volume of commerce attributable to an individual participant in a conspiracy," which is "the volume of commerce done by him." Thus,

---
Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)        4

only the portions of property that he personally purchased should be considered in setting Kevin Cullinane's sentence. By that measure, his volume of commerce is significantly less than $10 million, and therefore the adjustment to his Offense Level should at most be 2, not 4.

### B.  *Role in The Offense*

The PSR suggests that Kevin Cullinane's Offense Level should be adjusted upward by 3 levels due to his role as a "manager or supervisor" of the criminal activity. This appears to be based on two different factors: his relationship to the other bidders involved in the conspiracy, and his alleged employment of others, particularly Bob Guglielmi, to perform tasks on his behalf. These factors do not support the recommended adjustment.

With respect to the other bidders, the description of those bidders as being under the "control" of "the Big 5," let alone Kevin Cullinane, is simply incorrect. The participants in the foreclosure auctions and bid-rigging were sophisticated business persons acting in their own self-interest. No one was empowered to tell another when or how much to bid; each participant made those decisions for his/her self. In reality, they were rivals who agreed on the structure for their rivalry but acted independently within it.

Although some participants may have played a more active role in the auction, this is not enough. A defendant is properly considered as a manager or supervisor only if he exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or supervise lower level participants. *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990).

"Control" is not superior bargaining position, greater leverage, deeper pockets or a better strategy. It is the ability to instruct another person what they must or must not do. There was no such control in these agreements. At most, those with a greater position might prevail in a particular auction, but each participant crafted his or her own strategy and made bids on the basis

---
Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)  5

of self-interest.

The reality of the relationship between bidders was recognized by Judge Hamilton in the *Galloway* matter, in which she responded to the government's suggestion that the defendant there be assessed a 4-point enhancement for his role in the offense, as follows:

> "The government has argued that Mr. Galloway should be deemed a leader, an organizer or manager/supervisor largely because of his relationship with directing Mr. Diaz and I totally agree with that. I don't think he just offered him an opportunity. He supervised him. He told him what to do. He called – talked to him on the phone. But one of the other bases for the government's position is that in addition to supervising one other member, he was also a leader and organizer of the conspiracy as a whole. And what – and so you've argued that he – that argument is based upon the fact that he led and organized rounds. He supervised Diaz. He recruited others. And he intimidated outsiders. Those are the four arguments you make in your papers. Well, intimidation is obviously a matter of perception. And it's the perception of the person being intimidated that's most crucial. I've heard some of that in prior trials. And with regard to recruiting of others, it seems to me that that happens on a fairly regular basis with regard to everybody who participated in it. I mean, the way in which the – the auction occurred suggests – it certainly suggests to me from the testimony that I've heard that any participating member could do the wink or the nod and you want to round this. I mean, there wasn't one group that was directing all of the activity. Everyone was in it for themselves. Now that doesn't mean there weren't these individual pods that – you've charged people together in these groups that logically fit together because of their business relationships, but – but I'm not at all persuaded that there was any one group or any one person who was in charge of it all
>
> \* \* \*
>
> From what I've heard so far, it seems to me that everybody was in it for themselves and everybody was making a decision for themselves or for their business group what bids were important. And even within the business groups in order to have more seats, more than one person per group participated in some of bids. I'm not persuaded that this enhancement is appropriate for the kind of conspiracy that we have here. So I am not going to apply it."
>
> *United States v. John Michael Galloway* (14 CR-607 PJH), Sentencing Hearing, 3/15/17.

Precisely the same characterization is appropriate here. As reflected in the statement given on December 20, 2017 to the FBI by co-defendant Raymond Grinsell, "everyone had their own money and everyone did their own research on properties . . . pay-offs during this time were

---

Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)                6

again a group decision." As in *United States v. Frega*, 179 F.3d 793, 811 (9th Cir. 1999), "all defendants were in effect in it together." Although there may have been differences in degree of influence, or available resources, those differences are not matters of control, they are matters of status.

The suggestion, presumably made by the government, that Kevin Cullinane should be designated a manager or supervisor on the basis of generalities about the conduct of the so-called "Big 5" must also be rejected because it fails to identify any specific conduct by Kevin Cullinane that satisfies the requirements of U.S.S.G. § 3B1.1(b) or to provide any evidence for the attribution to him of responsibility for the specific conduct of others.

In fact, Kevin Cullinane's role within the so-called "Big 5" was clearly secondary. As Special Agent Wynar testified, Kevin was rarely present at the auctions and rarely participated in negotiations and agreements. (Transcript, 1/19/17, p.339). His principal role was to research the status and value of properties. This may have been an important role, but it was not a role in which he *personally* controlled anyone else's criminal activity.

The allegation that Kevin Cullinane involved his employee Bob Guglielmi and others in some of his activities, even if true, is also insufficient to attribute a leadership role to him. "[A] manager or supervisor is one who exercised some degree of control over others *involved in the offense*." *United States v. Chau*, 293 F.3d 96, 103 (3rd Cir. 2002) (emphasis supplied). "Participants are persons involved in the criminal activity who are criminally responsible, not innocent bystanders used in the furtherance of the illegal activity." *United States v. Harvey*, 532 F.3d 326, 338 (4th Cir. 2008); *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001); see also, U.S.S.G. § 3B1.1 Application Note 1, and *United States v. King*, 257 F.3d 1013, 1024 (9th Cir. 2001). There is no evidence for the allegation that Bob Guglielmi or any other person employed by Kevin Cullinane was a participant in the criminal activity or involved in the

offense.

3. *Disparity of Sentences*

Although it is not known what sentences the Court will impose on the various defendants in this case, the government's conduct of the case has created a circumstance that invites, indeed virtually compels, unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

At the beginning of 2012 Kevin Cullinane, through his counsel, informed the government that he was prepared to plead guilty to bid-rigging and to provide complete information about his own activities and those of others. The government rejected this offer because it insisted that Kevin could not cooperate unless he was willing to plead guilty to mail fraud.

This presented an insurmountable barrier because, in fact, neither Kevin nor anyone else involved in the bid-rigging had committed mail fraud and the charge was entirely inappropriate and unjust. In addition, the charge of mail fraud carries far more stigma than bid-rigging, as well as much higher potential sentences. After full consideration, and with concurrence of counsel, Kevin concluded that he should not be forced to plead to a serious crime that he did not commit simply to curry favor with the government, and Kevin therefore declined the offer. However, he authorized counsel on his behalf to put the offer in writing to then-Assistant United States Attorney David Ward.

Apparently, most of the other defendants reacted differently, and eighteen of the twenty-three defendants agreed to plead guilty to mail fraud[1] so that they could enter into cooperation agreements.

In August 2016, Judge Hamilton ruled in the *Galloway* case that the activity of the

---

[1] Three additional defendants pleaded guilty to bid-rigging only, after the mail fraud charges were dismissed following the ruling by Judge Hamilton in the *Galloway* matter.

Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)          8

defendants involved in bid-rigging at foreclosure auctions did not constitute mail fraud. This decision, which occurred more than five years after the investigation of Kevin and his co-defendants became public and more than four years after he offered his full cooperation, was so clearly correct that the government not only failed to appeal, but in fact dismissed all pending mail fraud charges against defendants who had not pleaded, and even allowed defendants who had previously pleaded – such as the cooperating defendants in this case – to withdraw their mail fraud pleas and proceed only on their bid-rigging pleas. In other words, Kevin Cullinane was completely vindicated in August 2016. However, his opportunity to cooperate had long since passed, through no fault of his own.

As a result of the arbitrary and unreasonable requirements set by the government, defendants who were sufficiently intimidated that they were willing to plead to a crime they had not committed are in a position to be rewarded with substantial downward departures, while the government will demand that Kevin, despite his equal willingness to admit and accept responsibility for his actual conduct should be punished far more severely. This is the essence of "unwarranted disparity." Kevin should not be punished for the government's unwillingness – on legally erroneous grounds – to accept his offer of full cooperation. Specifically, the Court is urged to consider what sentence it would impose on Kevin Cullinane, giving consideration to all the factors of his case, including those under § 3553, if he had been allowed to cooperate as he offered to do.[2]

---

[2] Defendant anticipates that the government will point to the fact that he was offered the opportunity to cooperate late in the litigation, when he and the other four remaining defendants announced their intention to plead to the bid-rigging charge. This is the elevation of form over substance. As the government will certainly argue in the case of the three defendants who entered into cooperation agreements within the last few months, their cooperation is far less significant, and valuable to the government, than was the early cooperation of others who assisted the government in framing the case when it was still in formation. At this point, it is
Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)    9

4. *U.S.S.G. § 3553 Factors*

Both the nature and circumstances of Kevin Cullinane's offense as well as his history and characteristics argue strongly for a substantial variance in this case.

      A. *The Nature and Circumstances of the Offense*

At least two aspects of Kevin Cullinane's offense mitigate its severity: the context in which it occurred and the actual impact that it had on its ostensible victims.

As the Court is certainly aware, the circumstances in which the offense arose, indeed the circumstances which made the offense possible, were the greed and dishonesty of banks and lending institutions that drew millions of people into loans they could not afford and upon which many inevitably defaulted resulting in cataclysmic financial upheaval and the near collapse of our economy. Hundreds of thousands of homeowners suffered foreclosure and eviction, leaving their homes vacant and abandoned. Kevin Cullinane and the other defendants involved in this and other related cases played no role in that destruction, and bear no responsibility for the losses suffered by innocent homeowners. Their conduct did not begin until after the devastation was complete. Yet, rather than prosecuting the banks and institutions that were responsible for the economic collapse, the federal government's choice was to protect them and to focus instead on prosecuting the victims of their greed, such as the borrowers who were enticed and encouraged to submit inflated loan applications in order to qualify for sub-prime mortgages, as well as the foreclosure auction bidders whose action in no way contributed to the crisis but whose activities withheld relatively minor amounts of money from the bankers and lenders. The disproportion of culpability between those who were rescued by our government and those who were prosecuted is stunning.

---

virtually an empty gesture that would not come close to the consideration that Kevin would have received if allowed to cooperate in 2012.

Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)          10

What is even more important for consideration at this juncture is the actual impact of the conduct of Kevin Cullinane and the other auction bidders, particularly the four with whom he joined in a loose partnership. They did not merely buy houses and flip them for a quick profit. Rather, they bought distressed properties, often in blighted communities, and renovated them. This is not to suggest that they were acting for altruistic reasons, but it is to suggest their conduct while criminal, was not to the detriment of the community, but often to its benefit.

Of course, as a consequence of their conduct banks and lenders did not receive all of the money that they might have, but they received at least as much as they demanded. And, had Kevin and the others refrained from bidding, the houses would simply have gone as losses to the banks. Moreover, a careful analysis of the results of foreclosure auctions in San Mateo county during the period in which Kevin Cullinane and his co-defendants were involved demonstrates that the difference between the minimum bid and the actual sale price on houses that the group bid on was approximately seven percent higher than the average for houses on which they did not bid.

Viewed fairly and objectively, the nature and circumstances of Kevin Cullinane's offense is significantly mitigated in comparison to the conduct that is generally addressed by the bid-rigging Guidelines, and a downward variance is appropriate.

B.     *Defendant's Personal History and Characteristics*

But even more than the considerations regarding the offense, the most relevant justification for a substantial downward variance from the Guideline range tied to his Offense Level is, as the PSR properly recognizes, Kevin Cullinane's personal history and characteristics. Apart from the conduct that brings him before this Court his life has been not only unblemished, but exemplary.

Kevin rose from difficult and challenging circumstances to achieve considerable success

---
Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)                    11

both personally and financially. Significantly, however, he did not limit the benefits of his success to himself and his family; he has consistently reached out to share his good fortune with others. He is deeply committed to his family, his community and his faith and he embodies those commitments through consistent and substantial investment of his financial resources, his time and his effort.

This is evidenced by the attached letters from members of Kevin's family, his friends and the people in his community, particularly including those who have benefitted from his support, that give strong evidence of his generous and caring nature. Certainly, the most poignant of these testimonials center upon his family's experience in the tragic loss last year of his daughter Aliya, who was then 17, by suicide.

The import of the letters is not only that Kevin and his family have suffered an inconceivable loss, but that Kevin has responded to that loss with extraordinary courage and sensitivity. He has worked hard to maintain his own stability and purpose and to help his wife and surviving daughters deal with their grief. And he has turned his experience toward a concern for others undergoing both the turmoil that his daughter experienced and the loss that he and his remaining family suffered. He has contributed generously to and volunteered for organizations that assist troubled youth and has regularly extended himself to assist other families in his community whose children are going through suffering similar to his daughter's.

An example of the many letters from people whom Kevin has helped through the insight and empathy gained from his own tragic experience, is the letter provided by Charles Royals, the long-time president of a nationwide life insurance underwriter. Mr. Royals writes:

> "On a very personal issue, I would like to communicate a recent experience I had with Kevin. His Honor may be aware that approximately a year ago Kevin lost his beautiful 17 year old daughter to suicide. I have an 18-year old son who had recently lost his girlfriend. He was totally in love, dedicated and faithful to her.

---
Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)                    12

> She broke up with him and I knew he was desperately trying to get her back. My wife received a text from her saying that we needed to get our son immediate help. That he had told her he was going to commit suicide. That he knew how, when and where he was going to do it. When my wife called me I raced out of the office. It was in the summer and he was out of school. On the way home, I called Kevin knowing how hurt he was over the loss of his beautiful daughter. I called Kevin because I was concerned that my wife and I simply did not have the tools to do and say the right things. I knew that having to address his loss again would be a very painful experience for him. Kevin dropped everything and raced to my house. He spent two hours talking to my son with tears streaming down both of their faces. It is certainly possible that he saved my son's life. I can only imagine how difficult it was for him to make that trip."

The pain and loss that Aliya's death caused to Kevin and his family, which Kevin recognizes was at least indirectly the result of his own conduct, is a greater punishment than anything the criminal justice system can impose. But it may appropriately be considered in determining what additional punishment should be imposed.

As the PSR properly notes, Kevin Cullinane's family is fragile and emotionally dependent on him. Accordingly, a sentence of incarceration that takes him away from his family would be cruel, unjust, unwarranted and decidedly greater than necessary to comply with the purposes set forth in U.S.S.G. § 3553.

We recognize that the Probation Office has given the matter a great deal of thoughtful consideration and has given substantial weight to the extraordinary mitigating circumstances in Kevin Cullinane's case. But we respectfully disagree with the conclusion that sentencing parity requires some period of actual incarceration to be imposed, not only because this Court has not yet imposed any sentence to which Kevin Cullinane's could be compared, but also because even in comparison to others who have been sentenced to a period of incarceration by Judge Hamilton, the circumstances of Kevin Cullinane's offense and of his life wholly justify a non-custodial sentence.

---

Defendant Kevin Cullinane's
Sentencing Memorandum (CR-14-0534)                  13

In consideration of all the facts and circumstances, we respectfully urge the Court to grant a downward variance and to sentence Kevin Cullinane to probation with conditions including home detention, community service, restitution and a substantial fine.

Dated: April 18. 2018                    Respectfully submitted,

                                          LAW OFFICES OF DORON WEINBERG

                                        /s/ Doron Weinberg
                                        DORON WEINBERG
                                        Attorney for Defendant
                                        KEVIN B. CULLINANE