ANDREW J. MAST (CSBN 284070)
GABRIEL MARTINEZ (CSBN 275142)
MICHAEL RABKIN (ILRN 6293597)
ALBERT SAMBAT (CSBN 236472)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Andrew.Mast@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN CULLINANE,<br><br>           Defendant. | CASE NO. CR 14-00534 CRB<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

    The United States respectfully requests that this Court sentence defendant Kevin Cullinane to (1) serve 27 months of custody, (2) serve three years of supervised release, and (3) pay a criminal fine of $462,760, a $100 special assessment, and $139,258.32 in restitution.

## BACKGROUND

    On October 22, 2014, an eight count Indictment was filed, charging Cullinane with bid rigging and mail fraud.  Dkt. 1; Presentence Report ("PSR") ¶ 1.  On October 13, 2016, upon the government's unopposed motion, the Court dismissed the mail fraud charges, leaving one count

//

1  of bid rigging against Cullinane.  PSR ¶ 2.  On September 19, 2017, Cullinane pleaded guilty

2  without a plea agreement to Count 1 of the Indictment.  PSR ¶¶ 3-4.

3        Cullinane is charged with participating in the conspiracy in San Mateo from August

4  2008 through January 2011.  Together with co-conspirators Joseph Giraudo, Raymond Grinsell,

5  Mohammed Rezaian, and Daniel Rosenbledt, Cullinane was a member of the "Big 5," the most

6  dominant group of bidders at the auctions.  PSR ¶ 16; *See* Ex. M at 7-8.  Although he was not

7  charged with participating in the San Francisco conspiracy, Cullinane was also involved in

8  rigging properties in San Francisco on a more limited basis.  PSR ¶ 19; Exhibit A.

9        Cullinane's involvement rigging properties extends back as far as the late 1990s.  In

10 2010, Cullinane told Laith Salma that payoffs had been occurring at the auctions since he began

11 attending eleven years ago.  PSR ¶ 19; Ex. L at 1.  Initially, Cullinane worked closely with

12 Daniel Rosenbledt.  However, around 2008, as more people began attending the auctions and

13 competition increased, Giraudo, Grinsell, Rezaian, Rosenbledt, and Cullinane banded together as

14 the Big 5 so that they could have more control over the auctions.  PSR ¶ 16; Ex. F at 2.

15       Compared to the other members of the Big 5, Cullinane attended the auctions less

16 frequently.  PSR ¶ 17.  However, he was significantly involved in negotiating payoff agreements

17 and was responsible for negotiating payoff agreements with people who he knew better than the

18 other members of the Big 5.  PSR ¶ 17; *See* Ex. G at 5.  These people included Laith Salma, Troy

19 Kent, and Matt Worthing, among others.  PSR ¶ 17; Ex. M at 7; Ex. E at 4.

20       For example, at an auction for a property located at 611 Fairway Circle in Hillsborough,

21 Cullinane negotiated a $150,000 payoff agreement with Laith Salma's associates.  PSR ¶ 18; Ex.

22 M at 1-2.  Salma attempted to renegotiate the payoff amount with Cullinane, but Cullinane told

23 Salma that if he did not pay, he would ruin his family's reputation.  PSR ¶ 18; Ex. M at 1-2.

24 Salma subsequently paid Cullinane the agreed-upon $150,000.[1]  PSR ¶ 18; Ex. M at 1-2.

---

[1] Cullinane contends that this payment was not a payoff but rather a brokerage fee based on a "side agreement entered into after the bidding by Cullinane and Salma's father, which was based on the fact that Cullinane had brought the property to Salma's father." PSR ¶ 18(a).  But Cullinane's description of the transaction is contrary to Salma's description and shows that Cullinane has not yet fully accepted responsibility for his unlawful conduct.  *See* Ex. M at 1-2.  It is clear that Salma identified the Fairway property before it was put up for auction because it was

US' SENT'G MEMO                         2
*United States v. Cullinane*, CR 14-00534 CRB

Likewise, during the auction for 617 Woodside Way in San Mateo, Cullinane offered Kent $10,000 to stop bidding. PSR ¶ 18; Ex. E at 4. However, Kent was even more interested in purchasing the property than Cullinane and agreed to pay Cullinane $12,000 not to bid against him. PSR ¶ 18; Ex. E at 4.

Cullinane directed others to participate in bid-rigging conduct on his behalf. For example, Kent went to the auction to collect a $9,000 payoff from Cullinane. PSR ¶ 18; Ex. E at 6. Instead of Cullinane delivering the money, however, Kent accepted the money from an individual named Gary, who paid him on Cullinane's behalf.[2] PSR ¶ 18; Ex. E at 4. Similarly, on occasion, instead of delivering a payoff to Salma directly, Cullinane left an envelope filled with cash with Salma's name on it with the receptionist at his company, SC Properties. PSR ¶ 18; Ex. M at 8. More regularly, Cullinane directed an unindicted co-conspirator ("BG") to attend the auctions on Cullinane's behalf. PSR ¶ 18; Ex. H at 11; Ex. G at 5. BG was aware of the payoff agreements being made at the auctions and made cash payoffs to Rosenbledt on multiple occasions. PSR ¶ 18; Ex. H at 11; Ex. G at 5.

Although Cullinane was a member of the Big 5, he deferred to Giraudo. For example, after the Big 5 arranged for the auction of a property located at 125 Merced in San Bruno to be conducted in secret, Salma called Cullinane to complain. PSR ¶ 19; Ex. M at 8-9. Cullinane offered to "make this right." PSR ¶ 19; Ex. M at 8-9. However, when Salma insisted on a $30,000 payoff for the property, Cullinane indicated that he needed to call Giraudo to get permission. PSR ¶ 19; Ex. M at 8-9. Giraudo refused the $30,000 payoff, which Cullinane

---

located in his neighborhood and he wanted to purchase the property as his residence. Ex. M at 1. Salma would not have had any legitimate cause to pay a finder's fee to Cullinane for that property.

[2] The government believes this individual is co-defendant Gary Anderson. Cullinane indicates that he did not know anyone associated with the auctions named Gary and never gave cash to a person named Gary. However, Cullinane need not have known Anderson's name, nor provided him cash directly to pay Kent on Cullinane's behalf. The conspirators frequently made payoffs by off-setting debts from prior payoffs. Ex. C at 7-8. Accordingly, Cullinane need not have provided cash directly to Anderson in order to be involved in the payoff agreement. In fact, Kent surmised that "Gary" owed Cullinane money, but off-set his debt by paying Kent. Ex. E at 6.

US' SENT'G MEMO                    3
*United States v. Cullinane*, CR 14-00534 CRB

relayed to Salma. Ex. L at 4. Later, Giraudo agreed to pay $30,000, but insisted it be paid in the form of a check so that Salma would have to pay taxes on the payment. PSR ¶ 19; Ex. L at 4.

Ultimately, Cullinane was involved in rigging 69 properties in San Mateo. as well as 2 in San Francisco, and has a total volume of commerce of $18,510,413.66.[3] PSR ¶ 20; Ex. A (List of Rigged Properties). Cullinane's volume of commerce does not account for the 27 instances in which Cullinane accepted payoffs not to bid for which Cullinane personally received $139,108.33. PSR ¶ 20; Ex. A.

# ARGUMENT

**A.    Sentencing Guidelines Calculations**

    **1.    Criminal History**

The government agrees with the Presentence Report (PSR), which calculates defendant's Criminal History Category as I based on no criminal history. PSR ¶ 41.

    **2.    Offense Level**

The government agrees with the PSR, which calculates the total offense level as 17. PSR ¶ 36. This calculation includes a one-level increase to the base offense level of 12 for conduct involving the submission of non-competitive bids, a four-level increase for a volume of commerce exceeding $10 million, a three-level increase for role in the offense, and a downward reduction of three levels for acceptance of responsibility.[4] PSR ¶¶ 26-35. U.S. Sentencing

---

[3] The PSR calculates Cullinane's volume of commerce at $17,066,957.67, apparently removing the commerce associated with Cullinane's involvement in two bid-rigging agreements in San Francisco (for which he was not charged in the Indictment). Under U.S.S.G. §1B1.3, Cullinane's involvement rigging properties in San Francisco is relevant conduct that can be considered in determining his Guidelines range. Here, however, whether Cullinane's volume of commerce is $18.5 million or $17 million, does not affect his Guidelines range for his custodial sentence.

[4] However, the government reserves the right to not make a motion for an additional point for acceptance of responsibility under U.S.S.G. 3E1.1(b) depending on the defendant's representations at sentencing. For example, Cullinane has not accepted responsibility for his involvement in the rigging of 611 Fairway Circle in Hillsborough, in which Cullinane negotiated a $150,000 payoff agreement with Laith Salma's associate. *See* PSR ¶ 18; Ex. M at 1-2. If Cullinane contests his involvement in the rigging of a substantial number of other properties, the government would not make a motion under U.S.S.G. 3E1.1(b).

Guidelines Manual ("U.S.S.G.") §§2R1.1(b)(1), 2R1.1(b)(2), 3B1.1(b), 3E1.1(a), and 3E1.1(b) (U.S. Sentencing Comm'n 2016).

Under the Sentencing Guidelines, an offense level of 17 and Criminal History Category of I results in a sentence ranging from 24 to 30 months of imprisonment.

### 3.     Fine and Restitution

Cullinane's Guidelines fine range is $185,104.14 to $925,520.68.[5] *See* PSR ¶ 75; U.S.S.G. §2R1.1(c)(1) (fine range shall be from one to five percent of the volume of commerce, but not less than $20,000).  The government recommends a $462,760 fine, representing a fine in the middle of the Guidelines range.  Given Cullinane's substantial assets, however, even a fine at the top of the Guidelines range—which would have little impact on Cullinane's overall finances—will not provide an adequate deterrent without an accompanying custodial sentence.

The United States recommends restitution of $139,258.32.  This represents payoff money received by Cullinane to refrain from bidding on properties.  Ex A.  This differs slightly from the PSR, which calculates $135,108.34 in restitution.  PSR ¶ 73; U.S.S.G. §5E1.1.  This variance exists because, after submitting materials to the Probation Office, the government identified an additional property in which Cullinane received a payoff to refrain from bidding.

## B.     Basis for Specific Offense Adjustments

A four-level enhancement applies if the "volume of commerce attributable to the defendant" was more than $10 million.  U.S.S.G. §2R1.1(b)(2).  Cullinane contends that the volume of commerce adjustment should be two instead of four because Cullinane held only a partial ownership stake in the rigged properties.  But the Guidelines indicate that "[t]he volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." *Id.*  When Cullinane purchased properties pursuant to a partnership or joint venture agreement, his volume of commerce appropriately reflects properties purchased by that partnership or joint venture.  *See*

---

[5] The PSR calculates a fine range of $188,062 to $940,310.  After submitting its initial list of rigged properties to Probation, the government determined that certain rigged auctions were cancelled by the beneficiary, and thus are not included as part of Cullinane's volume of commerce.

US' SENT'G MEMO                                 5
*United States v. Cullinane*, CR 14-00534 CRB

*Texaco Inc. v. Dagher*, 547 U.S. 1, 3 (2006) ("When 'persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm.'") quoting *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 356 (1982). For purposes of calculating volume of commerce, Cullinane and his partners are "regarded as a single firm."[6] *Id.*

Cullinane likewise contends that the government has not established its burden to establish that the specific-offense adjustment applies. But the government provided Cullinane a list of rigged properties and evidence establishing that the properties were purchased pursuant to bid-rigging agreements in which Cullinane participated. This evidence includes reports from witness interviews, audio/video recordings made by cooperating sources and an undercover agent; and pay/owe ledgers made by co-conspirators. Ex. A; PSR ¶ 15. The four level volume-of-commerce enhancement reflected in the PSR is thus appropriate because Cullinane's volume of commerce exceeds $10 million.[7] Ex A.

**C.    Basis for Role in the Offense Adjustment**

A three-level enhancement for Cullinane's role in the offense is warranted. Guidelines Section 3B1.1 provides that if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants," a three-level enhancement should be applied. In order to justify a three-level upward adjustment under §3B1.1(b), a defendant need only have managed or supervised one other participant involved in

---

[6] If the Big 5 was not a single entity, many more properties than the government counted should be considered rigged. The government did not count properties purchased by joint ventures or partnership as rigged unless they were purchased pursuant to a payoff agreement (either with another bidder, individually, or with a separate partnership). Cullinane cannot, at the same time, claim the Big 5 should be counted as a single entity when purchasing properties but not be counted as a single-entity when counting for volume of commerce. *See* Defs.' Post-H'rng Br. Re. Direct and Indirect Use of Illegal Recordings (Dkt. 232) at 6.

[7] Cullinane's total volume of commerce does not account for the 27 instances in which he received payoffs not to bid, nor the instances in which a rigged sale was subsequently canceled.

the commission of the crime.[8]  *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993).  A defendant manages or supervises another if he exercises "some degree of control or organizational authority" over that person.  *United States v. Koenig*, 952 F.2d 267, 274 (9th Cir. 1991).  In distinguishing between a leadership role and one of "mere management," the commentary to §3B1.1 directs that the following factors be considered: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.  U.S.S.G. §3B1.1, Application n. 4.

Here, the conspiracy plainly involved more than five participants:  23 have pleaded guilty.  Moreover, Cullinane's role as a member of the Big 5 shows a manager/supervisor enhancement is necessary.

Cullinane exercised "some degree of control" over multiple conspirators.  For example, Cullinane directed unindicted co-conspirator "BG" to attend the auctions on Cullinane's behalf.  PSR ¶ 20; Ex. G at 5; Ex. D at 5-6.  BG was aware of the payoff agreements being made at the auctions and made payoffs to Rosenbledt on multiple occasions.  PSR ¶ 20; Ex. H at 11; *see also* Ex. B.  In addition to BG, Cullinane also supervised his employees at SC Properties, who were, perhaps unwittingly, involved in the conspiracy when Cullinane directed them to provide envelopes of cash to other conspirators.  PSR ¶ 20; Ex. M at 8.

In addition to utilizing a representative on his own behalf, Cullinane had influence over other bidders at the auctions.  When Laith Salma attempted to renegotiate a $150,000 payoff with Cullinane, Cullinane threatened to ruin Salma's reputation.  PSR ¶ 20; Ex. M at 8.  This threat ensured Salma would adhere to the payoff agreement.  PSR ¶ 20; Ex. M at 8.

---

[8] Although §3B1.1(b) is applicable only if there are at least five participants in the conspiracy, "there is no requirement . . . that the defendant exercise authority over at least five participants before the enhancement can be applied." *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993).

Cullinane was also a member of the Big 5, which as a group managed the conspiracy. Cullinane served as "the ambassador" between the Big 5 and certain bidders and at the auctions because some bidders perceived Cullinane as more approachable than the other members of the Big 5. Ex. M at 7. Nevertheless, when bidders did not cooperate with the Big 5, Cullinane told them, "Don't make Joe angry." Ex. M at 7. The Big 5 set the rules of the conspiracy and insisted that other bidders follow those rules at the auction. PSR ¶ 20; Ex. M at 7-8. Cullinane—along with Giraudo, Rezaian, Grinsell, and Rosenbledt—told Salma that unless Salma agreed to participate in bid rigging, they would make it difficult for him to purchase properties at the auctions. PSR ¶ 20; Ex. J at 13.

A three-level role enhancement is also necessitated by the volume of rigged properties purchased and payoffs accepted by Cullinane, which far exceeds those of his co-conspirators. Cullinane was involved in 71 bid-rigging agreements. Ex. A. Apart from the other members of the Big 5, none of his co-conspirators was involved in even half as many rigged properties.

Although a three-level upward adjustment is necessary, Cullinane should not receive the four-level adjustment reserved for leaders or organizers. Giraudo was the leader of the Big 5 and Cullinane deferred to him. For example, after the Big 5 arranged for the property located at 125 Merced to be auctioned in private, Salma insisted to Cullinane that he receive a $30,000 payoff. PSR ¶ 19; Ex. M at 8-9. In his conversation with Salma, Cullinane spoke on behalf of the Big 5, but also indicated he needed to obtain approval from Giraudo before agreeing to the payoff. PSR ¶ 19; Ex. M at 8-9.

For the foregoing reasons, a three-level upward adjustment for Cullinane's role in the offense is warranted.

C. **Sentencing Recommendation**

The government's recommendation of 27 months is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553. The bid-rigging conspiracy in San Mateo was a serious, far-reaching crime that corrupted a fair and competitive process meant to compensate mortgage holders, homeowners, and other beneficiaries following a home foreclosure. Cullinane and the other members of the Big 5 bred distrust in the auction process

and discouraged investors from attending the auctions and bidding on properties by demanding payoffs. Ex. I at 1. Cullinane was among the most culpable members of the conspiracy, and even after pleading guilty, does not appear to fully appreciate the harm caused by his conduct. *See supra* footnote 3; *see also* PSR ¶ 25. Accordingly, only a substantial, custodial sentence will adequately reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to future bid-rigging offenses and white-collar crime generally.

A sentence of 27 months accounts for the seriousness of the offense. The commentary to the Guidelines makes clear that "prison terms for [Antitrust] offenders should be . . . common" and "alternatives such as community confinement [should] not be used to avoid imprisonment of antitrust offenders." U.S.S.G. §2R1.1, cmt. n. 5 & Background. If anything, the Guidelines understate the seriousness of Cullinane's conduct. Cullinane's volume of commerce includes properties he purchased in exchange for paying off others, but does not account for the 27 instances in which he received payoffs not to bid. Thus, the Sentencing Commission has recognized that in bid-rigging cases such as this, "understatement of the seriousness is especially likely," and that "[t]he court should consider sentences near the top of the guideline range." U.S.S.G. §2R1.1 cmt. n.6.

A 27-month sentence is also necessary to adequately deter future violations of antitrust laws and white-collar crime generally. *See* 18 U.S.C. § 3553(a)(2)(B). Indeed, "perhaps paramount among the purposes of punishment is the desire to deter similar misconduct by others." *United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985). And the Sentencing Reform Act notes that for white-collar crimes, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 98-225, at 91-92 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75.

A non-custodial sentence would not provide adequate deterrence. First, given Cullinane's substantial assets, even a fine at the top of the Guidelines range would not—in the absence of a custodial term—serve as an adequate deterrent. "To provide a mere slap on the wrist of those convicted of serious economic crimes, with no or virtually no time imprisoned as

US' SENT'G MEMO                                  9
*United States v. Cullinane*, CR 14-00534 CRB

punishment, strikes a blow to the integrity of our criminal justice system." *United States v. Ruff*, 535 F.3d 999, 1006 (9th Cir. 2008) (Gould, J. dissenting).  Second, the bid-rigging conduct in this case, and at auctions across California generally, was rampant.  In addition to the 23 defendants convicted in this case, 51 defendants were convicted for participating in bid-rigging conspiracies occurring in Alameda and Contra Costa counties, and 12 defendants were convicted for participating in a bid-rigging conspiracy in San Joaquin County.  Bid rigging at foreclosure auctions is a national problem.  Indeed, earlier this month, real estate investors pleaded guilty to bid rigging at foreclosure auctions in Mississippi.   A non-custodial sentence would not serve as an effective deterrent for others because a lenient sentence would be perceived as a minimal cost of doing business in exchange for the potential windfall from ill-gotten financial gains.

Additionally, a 27-month sentence is necessary to avoid unwarranted sentencing disparity.  18 U.S.C. § 3553(a)(6).  Judge Hamilton, who presided over the East Bay bid-rigging cases, imposed Guidelines sentences for non-cooperating defendants like Cullinane.  Michael Marr, one of the most culpable defendants in the East Bay was sentenced to 30 months imprisonment.  Marr's lieutenants, Javier Sanchez and Gregory Casorso, received 21 months and 18 months respectively.[9]  And Cullinane is more culpable than Sanchez and Casorso who predominantly purchased properties on behalf of Marr.  Cullinane, in contrast rigged bids for his own profit.  Therefore, like these defendants, Cullinane's conduct necessitates a substantial custodial sentence.

Probation recommends a dramatic variance from Cullinane's Guidelines calculations, reducing his term of incarceration to one-third of the low end of the Guidelines range.  As discussed above, and given the magnitude of the financial harm caused by Cullinane's conduct, a variance is not warranted.  The foreclosure auctions were vulnerable to bid rigging, especially in the aftermath of the foreclosure crisis, when the auctions were flooded with investment

---

[9] Marr, Sanchez and Casorso were convicted after trial and did not receive credit for accepting responsibility.  However, Judge Hamilton also sentenced defendants who pleaded guilty, but did not cooperate with the investigation, to Guidelines sentences.  *See e.g.*, Judgment, United States v. Stephan Florida, Case No. CR 14-582 PJH, Doc. No. 414; (Guidelines sentence of 10 months) and Judgement, United States v. John Galloway, Case No. CR 14-607 PJH, Doc. No. 291 (Guidelines sentence of 12 months).

US' SENT'G MEMO                            10
*United States v. Cullinane*, CR 14-00534 CRB

opportunities. Cullinane was a principal member of the conspiracy, participated in a high volume of rigged auctions, and threatened others to ensure adherence to the conspiracy. A 27-month sentence—based on an understated Guidelines calculation—adequately reflects the history and characteristics of Cullinane while also accounting for the seriousness of the offense and the need to provide adequate deterrence.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court sentence defendant Kevin Cullinane to (1) 27 months of custody, representing a mid-range Guidelines sentence, (2) serve three years of supervised release, and (3) pay a criminal fine of $462,760 fine, a $100 special assessment, and $139,108.34 in restitution.

Dated: April 19, 2018                                        Respectfully submitted,

/s/ ANDREW J. MAST
United States Department of Justice
Antitrust Division