ANDREW J. MAST (CSBN 284070)
GABRIEL MARTINEZ (CSBN 275142)
MICHAEL RABKIN (ILRN 6293597)
ALBERT SAMBAT (CSBN 236472)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Andrew.Mast@usdoj.gov
Telephone: (415) 934-5300

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN CULLINANE,<br><br>Defendant. | CASE NO. CR 14-00534 CRB<br><br>**UNITED STATES' RESPONSE TO DEFENDANT KEVIN CULLINANE'S SENTENCING MEMORANDUM** |

**ARGUMENT**

Defendant Kevin Cullinane was among the most culpable participants in bid-rigging conspiracies in which 23 defendants have pleaded guilty. Cullinane was involved in rigging 71 properties, and his volume of commerce, as measured by the winning bid and payoff amounts of the properties he purchased, is more than $18 million.[1] This justifies a four-level enhancement to his offense level under the Antitrust Guidelines. U.S.S.G. §2R1.1.

---

[1] This figure does not include the value of the rigged properties he *did not purchase* because he accepted a payoff not to bid.

U.S.' RESP. TO CULLINANE'S
SENTENCING MEMORANDUM                                              1
*United States v. Cullinane*, CR 14-00534 CRB

Cullinane's contentions that his volume of commerce (1) should be limited to his personal ownership stake in the properties he purchased, and (2) should be limited because the victims of his offense included banks should be rejected.[2]  Additionally, Cullinane's role in the offense as a manager and member of the Big 5 warrants a three-level enhancement.  Of the 23 defendants charged in this case, only four (Giraudo, Grinsell, Rosenbledt, and Rezaian) purchased more rigged properties, or accepted more in payoffs to refrain from bidding, than Cullinane.  Cullinane's volume of commerce—and, likewise, his ultimate sentence—should reflect his heightened culpability.

### A. Cullinane's Ownership Stake In the Property Does Not Limit His Volume Of Commerce

Cullinane does not contest that he was involved in the rigged properties that form the basis of his volume of commerce.[3]  But similar to codefendant Giraudo, he contends that his proportional (as opposed to complete) ownership stake in each of the properties he rigged provides a basis to limit his volume of commerce.  It does not.  Cullinane is responsible for the volume of commerce done by himself and done by his joint-venture partnerships.  As the Guidelines make clear, "the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation."  U.S.S.G. § 2R1.1(b)(2).

When Cullinane purchased rigged properties pursuant to a partnership or joint venture agreement (most frequently a joint venture agreement between the Big 5), the joint venture

---

[2] In contrast to his codefendant, Joseph Giraudo, Cullinane does not object to considering rigged properties purchased more than five years before his indictment as part of his volume of commerce.  Nor does he contend that his volume of commerce should not include the purchase price of the property.  While contesting a four-level enhancement based on volume of commerce, Cullinane concedes that a two-level enhancement is appropriate because his volume of commerce exceeds $1 million.  Dkt. 297 at 5.

[3] The government provided Cullinane and Probation with a list of rigged properties that identified the relevant evidence establishing that the properties were rigged and Cullinane was involved.  Dkt. 306, Ex. A.  Cullinane has had access to all of the identified evidence through criminal discovery for years and has had sufficient time to challenge the basis for including any particular property.  Exhibit N includes the underlying evidence identified in Exhibit A.

functioned as Cullinane's principal. Hence, the "commerce done by him or his principal" is the commerce done by Cullinane and his joint ventures. That a joint venture creates a principal-agent relationship is uncontroversial. *See* 46 Am. Jur. 2d Joint Ventures § 36 ("In accordance with the general rule that each member of a joint venture is deemed to be the agent of the other when acting in furtherance of the common objective, coventurers are agents of each other as to third parties for all acts within the scope of the enterprise, including wrongful acts, if the joint venturer has authority to act."); *see also* Judicial Council of California Civil Jury Instruction 3712 (2018) ("Each of the members of a joint venture, and the joint venture itself, are responsible for the wrongful conduct of a member acting in furtherance of the venture."). Therefore, all partners or coventurers are jointly and severally liable for partnership obligations, irrespective of their individual partnership interests, because joint and several liability arises from the partnership or joint venture. *Myrick v. Mastagni*, 185 Cal.App.4th 1082, 1091 (2010); *see also Second Measure, Inc. v. Kim*, 143 F. Supp. 3d 961, 971 (N.D. Cal. 2015).[4]

Attributing the entire purchase price of a rigged property purchased pursuant to a joint venture agreement to Cullinane's volume of commerce is no different than the typical volume-of-commerce calculation in antitrust cases, where a a company's CEO, Vice President of Sales, and Regional Sales Manager may each be held wholly accountable for the volume of commerce done by their organization.[5] Likewise, in the Alameda and Contra Costa bid-rigging cases, Judges Hamilton and Donato held that each member of an organization was responsible for the

---

[4] The government did not attribute properties purchased by Cullinane's joint ventures where no bid rigging occurred to Cullinane's volume of commerce, even though the joint ventures were formed for anticompetitive purposes, i.e., to stave off competitive bidding. In other words, if Cullinane formed a joint venture (among the Big 5 or otherwise) and the joint venture acquired a property *without a payoff*, the property was **not** added to Cullinane's volume of commerce. Instead, the properties specified on Cullinane's list of rigged properties represent transactions in which Cullinane, or his joint venture, paid off another bidder to buy the property.

[5] *See*, e.g., *United States v. AU Optronics Corporation, et al.*, 09-CR-0110 SI, Dkt. 963 at 10 (Sentencing Hearing Transcript) (court agreeing with $2.34 billion volume of commerce per defendant, the same volume of commerce as their corporate employer also convicted at trial); *compare United States v. Serra*, 08-CR-349-J-327 TEM, Dkt. 16 *with United States v. Gill*, 08-cr-351-J-32 TEM, Dkt. 18 (Senior Vice President and Marketing and Pricing Director each stipulated to same volume of commerce as their corporate employer)

U.S.' RESP. TO CULLINANE'S
SENTENCING MEMORANDUM                                3
*United States v. Cullinane*, CR 14-00534 CRB

total value of the rigged auctions they participated in on behalf of their principals, even where they had no equity whatsoever in the rigged property. *See e.g.* Sentencing H'rng of Michael Marr, Case No. 15-CR-580 PJH, 3/21/17 Tr. 21:14-24; Sentencing H'rng of Robert Rasheed, Case No. 14-CR-582 JD, 4/26/17 Tr. 9:7-13; 11:1-7.  And Rezaian, Rosenbledt, and Grinsell, who frequently purchased rigged properties as part of a joint venture with Giraudo and Cullinane, stipulated to a volume of commerce based on the entire price of the rigged property (plus the payoff), even though they owned a partial interest in the property.

### B. Cullinane's Volume of Commerce Should Not Be Limited Based on the Harm to His Victims or Because Many of the Victims of His Offense Were Banks

Cullinane also argues that he should not be held accountable for his full volume of commerce because many of the victims of his offense were banks and, in the absence of bid-rigging, the auction prices purportedly would have only been one or two percent higher. Cullinane does not offer any evidence to support this proposition, but it would not affect his offense level regardless.  The commentary to the Guidelines for antitrust offenses underscores that "offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish.  The volume of commerce is an acceptable and more readily measurable substitute." U.S.S.G. §2R1.1 cmt. <u>Background</u>.

Likewise, the Guidelines do not exclude volume of commerce when the victims of bid rigging are banks.  Moreover, although financial institutions (as lenders) were the most common victims of the bid-rigging conspiracies, homeowners were also victims when the foreclosed property sold at auction in excess of the outstanding loan amount.  In those circumstances, the homeowner would have received more money absent the defendants bid rigging. *See, e.g.*, Ex. O (showing the winning bid for 237 Randolph Street in San Francisco

//

//

//

exceeded the amount of unpaid debt). The fact that Cullinane does not sympathize with the victims of his offense does not provide a basis to lower his total volume of commerce.[6]

### C. Cullinane Was A Manager of the Conspiracy

A three-level enhancement to Cullinane's offense level is warranted because he was "a manager or supervisor (but not an organizer or leader)." U.S.S.G. §3B1.1. Cullinane acted as a manager of the conspiracy both through his membership in the Big 5, which collectively controlled the auctions, and when he directed an unindicted co-conspirator to act on his behalf. Cullinane contends that all the participants at the auctions were sophisticated business persons who operated as equals. But they did not operate as equals relative to the Big 5, to whom all other co-conspirators were inevitably subordinate. Many co-conspirators describe the role the Big 5 in their sentencing memoranda. Abraham Farag indicated that "the Big Five had enough capital to buy every property sold at the auctions, and if someone did not play by their rules, the Big Five would bid up every property that person wanted to buy." Dkt. 300 at 10 (Farag Sentencing Memo). Bob Williams indicated that "he was given the choice to go along with the group or be blocked from auction purchases." Case No. 13-cr-00388, Dkt. 44 at 6 (Williams Sentencing Memo). Lydia Fong indicated her dealings with the Big 5 "mirror the experience" of others who were dominated by the Big 5 at the auctions. Case No. 12-CR-301, Dkt. 52 at 3 (Fong Sentencing Memo). And Kuo Chang indicated that a "group of men said if you don't do it the way we do business here, you will not be able to get any property." Case No. 13-CR-670, Dkt. 44-1 at 2 (Kuo Chang Letter, attached to Sentencing Memo).

Cullinane was not a passive participant in the bid rigging that occurred at the auctions. When Laith Salma attempted to re-negotiate a $150,000 payoff with Cullinane, Cullinane

---

[6] Cullinane also states that his bid-rigging conduct does not fit into the agreements among competitors described by the Guidelines as "covert conspiracies that are intended to, and serve no purpose other than to, restrict output and raise prices, and that are so plainly anti-competitive that they have been recognized as illegal *per se*." Dkt. 297, at 4 (citing U.S.S.G. §2R1.1 app. n. 7). But the bid-rigging conduct at the auctions was plainly anticompetitive and the conspirators did attempt to conceal their illicit conduct and make payoffs to one another discreetly. Indeed, when Cullinane was first approached by the FBI in January 2011, he (like many of his co-conspirators) falsely denied his involvement in making or receiving payoffs not to bid. Ex. P at 2.

U.S.' RESP. TO CULLINANE'S
SENTENCING MEMORANDUM                             5
*United States v. Cullinane*, CR 14-00534 CRB

threatened to ruin Salma's reputation. Dkt. 306, Ex. M at 8. Cullinane served as an "ambassador" between the Big 5 and certain bidders. Dkt. 306, Ex. M at 7. Additionally, Cullinane directed an unindicted co-conspirator ("BG") to appear at the auctions and bid on his behalf. While Cullinane contends there is "no evidence" that BG was a participant in the criminal activity, multiple witnesses state otherwise. Both Rezaian and Rosenbledt reported that BG represented Cullinane at the auctions and participated in payoff agreements on his behalf. Dkt. 306, Ex. H at 11; Dkt. 306, Ex. G at 5. *Cf. United States v. Fuller*, 897 F.2d 1217, 1220-21 (1st Cir. 1990) (role in the offense enhancement was not warranted where defendant "did not rely on the assistance of others, but instead engaged in a number of private drug distributions, in which he essentially did all the work himself"); *cf. United States v. King*, 257 F.3d 1013, 1024 (9th Cir. 2001) (remand necessary to determine whether defendant exercised control over others involved in the criminal conduct). Unlike the defendants in cases where courts have declined to impose an aggravating-role enhancement, Cullinane exercised control over others involved in the offense. *Cf. Fuller*, 897 F.2d at 1220-21; *King*, 257 F.3d at 1024. Hence, a three-level enhancement is warranted for Cullinane's role in the offense.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court apply a four-level enhancement to Cullinane's offense level based on his volume of commerce and a three-level enhancement due to his role in the offense. Thus, combined with the base offense level of 12 and a one-level enhancement for his submission of non-competitive bids, Cullinane's total offense level is 17. *See* Dkt. 306. This yields a Guidelines range of 24 to 30 months. The United States requests the Court sentence Cullinane to a 27-month custodial term, a sentence which is both reasonable and not greater than necessary in light of the 18 U.S.C. § 3553(a) factors.

Dated: May 3, 2018                                                          Respectfully submitted,

/s/ ANDREW J. MAST
United States Department of Justice
Antitrust Division

U.S.' RESP. TO CULLINANE'S
SENTENCING MEMORANDUM                         6
*United States v. Cullinane*, CR 14-00534 CRB